Chad Pehrson (Utah State Bar No. 12622)
cpehrson@knh.law
**KNH LLP**
50 W. Broadway, 9th Floor
Salt Lake City, UT 84401
Telephone: 801-994-4646

Tina Wolfson*
twolfson@ahdootwolfson.com
Jeff Westerman*
jwesterman@ahdootwolfson.com
**AHDOOT AND WOLFSON, P.C.**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: 310-474-9111
(*Pro Hac Vice Application Forthcoming)

*Attorneys for Plaintiff and
Proposed Class Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HENRY ROACH, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>INSTRUCTURE, INC.,<br><br>      Defendant. | Case No.  2:26-cv-00562<br><br>**COMPLAINT**<br>**[PROPOSED CLASS ACTION]**<br><br>JURY TRIAL DEMANDED<br><br>Judge _____<br><br>Magistrate Judge _____ |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Henry Roach ("**Plaintiff**"), on behalf of himself and all others similarly situated (collectively, "**Class Members**"), by and through undersigned counsel, brings this Class Action Complaint against Defendant Instructure, Inc. ("**Instructure**" or "**Defendant**") and complains and alleges upon personal

1

knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1.      Instructure is an educational technology company that sells educational software products, including learning management software, to educational institutions.[1] One of the software products that Instructure offers to institutions is Canvas.[2]

2.      Canvas is a platform used by tens of millions of students, parents, teachers, and administrators.[3] These users include children in grades K-12, as well as college students.[4] For many students, parents, teachers, and administrators, use of Canvas is required to enroll in courses, participate in classroom discussions, and manage learning.[5]

3.      On information and belief, Canvas collects, obtains, and records information on its users, including names, social security numbers, emails, locations, video recordings, student ID numbers, and other personal information,[6] along with data on student performance and records of student messages ("**Personally**

---

[1] *See* Instructure, *Instructure*, https://www.instructure.com/ (last accessed May 8, 2026); *see also* Instructure, *Canvas*, https://www.instructure.com/canvas (last accessed May 8, 2026).
[2] *See* Instructure, *Canvas*, https://www.instructure.com/canvas (last accessed May 8, 2026).
[3] *See id*.
[4] *See* Instructure, *K12*, https://www.instructure.com/k12
[5] *See* Instructure, *Canvas*, https://www.instructure.com/canvas (last accessed May 8, 2026).
[6] *See* Instructure, *See Product Privacy Notice*, https://www.instructure.com/incident_update; https://www.instructure.com/policies/product-privacy-policy (last accessed May 8, 2026).

**Identifiable Information**" or "**PII**").[7]

4.      On information and belief, Instructure failed to protect information belonging to students, parents, teachers, and administrators. Instructure failed to adopt reasonable security procedures and practices that would keep user information private, including information belonging to minors.

5.      Plaintiff brings this action on his own behalf and on behalf of the Nationwide Class alleging negligence, breach of fiduciary duty, breach of implied contract, and unjust enrichment.

## PARTIES

*Plaintiff*

6.      Henry Roach is a resident of North Carolina who enrolled at the University of North Carolina at Wilmington ("**UNC**") in the fall of 2024. Mr. Roach is currently a student at UNC and anticipates graduating in the spring of 2028. He was required to use Canvas by UNC in order to submit assignments and school examinations, access lectures, communicate with professors, and complete other college-related tasks and assignments. He submitted Personally Identifiable Information to Canvas and Canvas collected Mr. Roach's Personally Identifiable

---

[7] *See* Instructure, *Security Incident Update & FAQs*, https://www.instructure.com/incident_update (last accessed May 8, 2026); *see also* Instructure, *Canvas*, https://www.instructure.com/canvas (last accessed May 8, 2026).

Information.

*Defendant*

7.　Defendant Instructure, Inc. is a public company that sells learning management software to institutions. Instructure is incorporated in Delaware with its principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, UT 84121.

## JURISDICTION AND VENUE

8.　This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00), there are in excess of 100 Class Members, the action is a class action in which one or more Class Members are citizens of states different from Defendant.

9.　The Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District.

10.　Venue properly lies in this judicial district because Defendant's principal place of business is located in this District and a substantial part of the events giving rise to Plaintiff's claims arose in this District.

## FACTUAL ALLEGATIONS

### *Defendant Collects Users' PII*

11.     Defendant Instructure collects PII on its users, including first and last name, gender or preferred pronouns, email addresses, location information, phone numbers, date of birth, research assignments, class assignments, and video images and voice recordings.[8]

12.     Defendant Instructure represents to users that it maintains foundational Privacy Principles to protect their PII, including transparency, accountability, integrity, security, and confidentiality.[9]

13.     Instructure tells users that it "protect[s] against unlawful or unintentional access or disclosure" of the information that Instructure collects.

### *Criminals Obtain User Information from Defendants*

14.     On April 29, 2026, the hacker group ShinyHunters infiltrated Canvas databases and obtained personal information belonging to Canvas users.[10]

15.     Canvas investigated the extent of the hack, and concluded that hackers

---

[8] *See* Product Privacy Notice, Instructure, accessible at https://www.instructure.com/policies/product-privacy-policy (last visited May 4, 2026) (Hereinafter referred to as the "Privacy Policy").

[9] *Id*.

[10] De Guzman, Chad, *What to Know About the Canvas Cyberattack That's Affected Thousands of Schools*, Time (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know.

had successfully obtained the personal information of Canvas users, including, at minimum, names, email addresses, student IDs, and messages.[11]

16.    On May 7, 2026, hackers again infiltrated Canvas databases and posted the following:



---

[11] *See* Instructure, *Security Incident Update & FAQs*, https://www.instructure.com/incident_update (last accessed May 8, 2026).

17.    This time, ShinyHunters claimed that it acquired from Instructure the data of 275 million individuals from nearly 9,000 schools.[12]

**_Defendant Uses and Benefits From Information Belonging to Its Users Without Properly Protecting the Information_**

18.    Instructure benefits from collecting the PII of its users, including Plaintiff and Class Members. Instructure obtains "aggregated and statistical data" that it collects from users, which it provides to third parties.[13] Instructure also employs user data to improve its platforms.[14]

19.    For example, Instructure uses the data it collects to "improve the functionality of Canvas" and "personalise and improve a user's experience using Canvas," among other things.[15]

20.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of personal information, such as

---

[12] *Id*.

[13] *See* Product Privacy Notice, Instructure, accessible at https://www.instructure.com/policies/product-privacy-policy (last visited May 4, 2026) (Hereinafter referred to as the "Privacy Policy").

[14] *See* Product Privacy Notice, Instructure, accessible at https://www.instructure.com/policies/product-privacy-policy (last visited May 4, 2026) (Hereinafter referred to as the "Privacy Policy").

[15] *Institutions & Educators Privacy | FAQ*, Canvas, https://www.instructure.com/privacy-security/institutions-educators-faq (last visited June 15, 2026)

encrypting the information or deleting it when it is no longer needed.

21. Defendant failed to secure its databases consistent with industry standards and best practices, allowing ShinyHunters to exfiltrate the PII of its users.

22. Upon information and belief, the ransomware group ShinyHunters and other cybercriminals have obtained PII, including names, addresses, dates of birth, locations, communications, and other highly sensitive personal information, of Canvas users following the Data Breach.

23. The Data Breach prevented Mr. Roach from accessing his study notes, examinations, and assignments. When the Data Breach occurred, Mr. Roach was preparing for final examinations and desperately needed access to Canvas for his study notes and final examinations. The Data Breach also prevented Mr. Roach from accessing his grades as normal. Instructure's inadequate security measures caused Mr. Roach stress and deprived him of the educational benefits of accessing his notes, communicating with his professors, obtaining feedback, and seeing his grades.

24. Following the Data Breach, Mr. Roach received an increase in spam calls, emails, and text messages. These fraudulent communications conveyed his personal information, including information about his full name, his enrollment at UNC, his email address, and cell phone number. Mr. Roach understood that as a result of the Data Breach, his personal information is now online. The Data Breach

forces Mr. Roach to be increasingly vigilant against fraud.

25. As a result of the Data Breach, Mr. Roach had to take time-consuming steps to protect himself from fraud, including blocking any suspicious numbers or email addresses, activating two-step verification on almost all of his online accounts, changing his account passwords, and responding with caution whenever an unsolicited messenger relays to him a message. He also frequently checks his online accounts for signs of unauthorized access/use.

***Defendant Knew That Criminals Target Personal Information***

26. At all relevant times, Defendant knew, or should have known that Plaintiff's and Class Members' PII was a target for malicious actors. In the past few years, data breaches in the education sector have gradually increased.[16]

27. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' personal information from cyber-attacks that Defendant should have anticipated and guarded against.

28. It is well known among companies who store sensitive personally identifying information that sensitive information—such as locations—is valuable

---

[16] Mallet, Gus, *Study: Cyberattacks Against US Education Sector Are on the Rise*, Tech.Co (September 8 2025), https://tech.co/news/cyberattacks-us-education-sector-rise.

and frequently targeted by criminals. Indeed, "[d]ata breaches are on the rise for all kinds of businesses. . . . Many of them were caused by flaws in . . . systems."[17]

29.    Personal information is a valuable property right.[18] The value of personal information as a commodity is measurable.[19] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[20] American companies spend many billions of dollars on acquiring the personal data of consumers.[21] It is so valuable to identity thieves that once personal information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[17] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[18] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[19] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[20] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed Oct. 5, 2023).

[21] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last accessed Oct. 5, 2023) (estimated to have spent over $19 billion in 2018).

30.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protection websites."[22]

31.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' personal information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of Personal Information Has Grave and Lasting Consequences for Victims***

32.     Theft of personal information is serious. The Federal Trade Commission ("**FTC**") warns consumers that identity thieves use personal information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[23]

33.     Identity thieves use personal information for a variety of crimes,

---

[22] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[23] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 5, 2023).

including credit card fraud, phone or utilities fraud, and bank/finance fraud.[24] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[25]

34.     With access to an individual's personal information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits, or; filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house,

---

[24] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[25] *See* Susan Henson, *What Can Identity Thieves Do with Your personal information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[26]

35.    Identity theft is a very difficult problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[27]

36.    Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of his SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

37.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other personal information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security

---

[26] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Oct. 5, 2023).

[27] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Oct. 5, 2023).

number and you don't have a credit freeze yet, you're easy pickings."[28]

38.    For these reasons, the information compromised in the Data Breach is significantly more valuable than the loss of basic financial information, because there, victims can cancel or close credit or debit card accounts. Upon information and belief, the information compromised by the Data Breach—for example, a Social Security number—is exceedingly difficult, if not impossible, to change.

39.    It is within this context that Plaintiff and Class Members must now live with the knowledge that their personal information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

***Defendant Fails to Comply With Industry Standards***

40.    Cyber security experts routinely identify entities in possession of personal information as being particularly vulnerable to cyberattacks because of the value of the information which they collect and maintain.

41.    As a result, several best practices have been identified that, at a minimum, should be implemented by entities in possession of personal information, like Defendant, including but not limited to: educating all employees on data

---

[28] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

protection; employing strong passwords; employing multi-layer security, including firewalls, anti-virus, and anti-malware software encryption; making data unreadable without a key; employing multi-factor authentication; employing backup data; and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices.

42. Defendant failed to follow, enforce, or maintain the aforementioned best practices. Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

***Damages Sustained by Plaintiff and the Other Class Members***

43. Plaintiff and Class Members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the

15

value of their personal information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; (vi) significant disruption to the Canvas platform and the associated services plaintiffs were required to use.

44.     Plaintiff and Class Members had a reasonable expectation of privacy in their sensitive personal information while using Canvas, the educational platform that they were required by their academic institution to use. Plaintiff and Class Members would not have provided their personal information to Defendant had they known that Defendant would fail to adequately protect their personal information.

45.     Indeed, Plaintiff and Class Members used the Canvas with the reasonable expectation that Defendant would keep their personal information secure and inaccessible to unauthorized parties. Plaintiff and Class Members would not have used Canvas had they known that Defendant failed to properly train their employees, lacked safety controls over their computer network, and lacked proper data security practices to safeguard their personal information from criminal theft and misuse.

46.     As a result of Defendant's failures, Plaintiff and Class Members are also at substantial and certainly impending increased risk of suffering identity theft

and fraud or misuse of their personal information. Indeed, Plaintiff's damages are not merely speculative. Consequently, Plaintiff and Class Members now face a substantially increased risk of identity theft that is plausibly imminent.

## CLASS ALLEGATIONS

47.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

48.    Plaintiff brings this action on behalf of himself and all Members of the following Class of similarly situated persons:

All persons in the United States whose personal information was accessed by and disclosed to unauthorized persons as a result of the Data Breach.

49.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

50.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

51.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52. While the precise number of Class Members has not yet been determined, the Members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and belief, the Data Breach affected at least tens of millions of individuals who are geographically dispersed.

53. Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' personal information from unauthorized access and disclosure;

b. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' personal information;

c. Whether an implied contract existed between Class Members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Class Members' personal information from unauthorized access and disclosure;

d.      Whether Defendant breached their duties to protect Plaintiff's and Class Member's personal information; and

e.      Whether Plaintiff and Class Members are entitled to damages and the measure of such damages and relief.

54.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

55.   Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed Members of the Class, had his personal information compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

56.   Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

57.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Nationwide Class)

58.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

59.    Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting the PII belonging to Plaintiff and

Class Members that was in Defendant's possession, custody, or control.

60.     Defendant knew the risks of collecting and storing Plaintiff's and Class Members' PII and the importance of maintaining secure systems. Defendant knew of the many data breaches that targeted businesses that collect sensitive personal information in recent years.

61.     Given the nature of Defendant's business, the sensitivity and value of the personal information it maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

62.     Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' personal information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect personal information entrusted to it—including Plaintiff's and Class Members' PII.

63.     It was reasonably foreseeable to Defendant that failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' personal information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies,

procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' personal information to unauthorized individuals.

64. But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their personal information would not have been compromised.

65. Defendant's duties also arise from Section 5 of the FTC Act ("**FTCA**"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendant, of failing to employ reasonable measures to protect and secure personal information.

66. Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class Members' personal information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of personal information it obtains and stores, and the foreseeable consequences of a data breach involving personal information including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

67. As a result of Defendant's above-described wrongful actions, inaction,

22

and want of ordinary care, and its negligence and negligence per se, that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information, for which there is a well-established national and international market; (v) the continued risk to their personal information which remains in Defendant's possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face. In addition, upon information and belief, Class Members already have suffered actual fraud and identity theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class Members.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiff and the Nationwide Class)

68.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69. Plaintiff and Class Members provided Defendant their personal information in confidence, believing that Defendant would protect their information. Plaintiff and Class Members would not have provided Defendant with this information had they known it would not be adequately protected. Defendant's acceptance and storage of Plaintiff's and Class Members' personal information created a fiduciary relationship between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its users, which includes safeguarding and protecting Plaintiff's and Class Members' personal information.

70. Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. Defendant breached that duty by failing to properly protect the integrity of their systems containing Plaintiff's and Class Members' personal information and failing to safeguard Plaintiff's and Class Members' personal information that they collected.

71. As a direct and proximate result of Defendant's breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their personal information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from

24

unauthorized use of their personal information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their personal information which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach. In addition, upon information and belief, Class Members already have suffered actual fraud and identity theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Nationwide Class)

72. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

73. By using Canvas, Plaintiff and Class Members entered into implied contracts with Defendant.

74. Pursuant to these implied contracts, Plaintiff and Class Members provided Defendant with their personal information. In exchange, Defendant agreed to, among other things, and Plaintiff understood that Defendant would: (1) take reasonable measures to protect the security and confidentiality of Plaintiff's and

25

Class Members' personal information; and (2) protect Plaintiff's and Class Members' personal information in compliance with federal and state laws and regulations and industry standards.

75. The protection of personal information was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Had Plaintiff and Class Members known that Defendant would not adequately protect its users' PII, they would not have used Defendant's Canvas platform.

76. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their personal information and used Defendant's platform.

77. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and secure their personal information and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII in a manner that complies with applicable laws, regulations, and industry standards.

78. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that

26

Plaintiff and Class Members have suffered from the Data Breach.

79.    Plaintiff and Class Members were damaged by Defendant's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their personal information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their personal information has been breached; (v) they were deprived of the value of their personal information, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Nationwide Class)

80.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.    This claim is pleaded in the alternative to the breach of implied contract claim.

82.    Plaintiff and Class Members conferred a monetary benefit upon Defendant when Defendant used their data to conduct research and analytics and

27

improve its platform, which supports Defendant's business operations and allows Defendant to profit.

83.    Defendant accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

84.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages. The damages, at a minimum, consist of the value of reasonable data privacy and security practices and procedures that Plaintiff and Class Members should have received in exchange for the benefits that Defendant accepted from Plaintiff and Class Members.

85.    Defendant should not be permitted to retain the monetary value of the benefits that it collected from Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures that were mandated by federal, state, and local laws and industry standards.

86.    Defendant should be compelled to provide to Plaintiff and Class Members all unlawful proceeds received by Defendant as a result of Defendant's conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other Members of the Class, respectfully requests that the Court enter judgment in his favor and against

Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard personal information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint

29

so triable.

Dated: June 18, 2026

                                    **KNH LLP**

                                    */s/ Chad Pehrson*
                                    Chad Pehrson

                                    **AHDOOT & WOLFSON, P.C.**

                                    Tina Wolfson*
                                    Jeff Westerman*

                                    *Attorneys for Plaintiff and
                                    the Proposed Class*

                                    *\* pro hac vice application forthcoming*

30